THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MELISSA SARVEY, ) | |
| ) | |
| ) | |
| Plaintiff ) | Case No. 1:16-cv-00157 (Erie) |
| ) | |
| ) | |
| JOHN WETZEL, Secretary of the ) | UNITED STATES MAGISTRATE JUDGE |
| Pennsylvania Department of Corrections; ) | RICHARD A. LANZILLO |
| JOANNE TORMA, Superintendent of SCI ) | |
| Cambridge Springs; JOYCE WILKES, ) | |
| Former Superintendent of SCI Cambridge ) | |
| Springs; KEITH MAYO, Corrections ) | |
| Officer at SCI Cambridge Springs; BRIAN ) | |
| SHANK, Former Corrections Officer at SCI ) | |
| Cambridge Springs, ) | |
| ) | |
| Defendants ) | |

MEMORANDUM OPINION

I.     Introduction

The Court of Appeals for the Third Circuit recently noted that the "sexual abuse of

prisoners, once overlooked as a distasteful blight on the prison system, offends our most basic

principles of just punishment" and "invades the most basic of dignity interests: to be treated as a

human being." *Ricks v. Shover*, 891 F.3d 468, 473 (3d Cir. 2018). In this case, Plaintiff Melissa

Sarvey, an inmate incarcerated with the Pennsylvania Department of Corrections, alleges that

Defendant Keith Mayo, a corrections officer at the State Correctional Institution at Cambridge

Springs (SCI-Cambridge Springs), sexually assaulted her in violation of the Eighth

Amendment's guarantee of freedom from "cruel and unusual punishment," and that the other

Department of Corrections Defendants acted with deliberate indifference to her safety and the

conditions that permitted Mayo's violation of her constitutional rights.

Currently pending before the Court is a motion for summary judgment filed by supervisory prison officials and a corrections officer. For the reasons discussed below, the motion will be granted in part and denied in part.

II.    Parties and Jurisdiction

Sarvey initiated this civil rights action on June 21, 2016, naming five individuals as defendants: John Wetzel, Secretary of the Pennsylvania Department of Corrections; Joanne Torma, former Superintendent of SCI-Cambridge Springs; Joyce Wilkes, the former Superintendent of SCI-Cambridge Springs; and Corrections Officers Keith Mayo and Brian Shank, both of whom worked at SCI-Cambridge Springs during the time relevant to this action. Defendants Wetzel and Torma have been sued in both their official and individual capacities.[1] ECF No. 1, at 3, ¶¶ 9,10. Defendants Wilkes, Mayo and Shank have been sued in their individual capacities. *Id.* at ¶¶ 11-13. All defendants except Mayo have moved for summary judgment.

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343. All parties have consented to having a United States Magistrate Judge exercise jurisdiction over this matter.[2] ECF No. 13, ECF No. 25. *See also* 28 U.S.C. § 636(c).

---

[1] Defendant Torma retired as Superintendent of SCI-Cambridge Springs in 2017 and, to the extent she has been sued in her official capacity, Superintendent Lonnie Oliver now stands in her stead. *See* Fed. R. Civ. P. 25(d); ECF No. 61, at 6 ¶ 41; ECF 67, at 4, ¶ 41.

[2] On September 24, 2018, this matter was reassigned from United States Magistrate Judge (now United States District Judge) Susan Paradise Baxter to the undersigned. ECF No. 73.

III.    Relevant Factual and Procedural Background[3]

Sarvey has been incarcerated at SCI-Cambridge Springs since 2012. ECF No. 1, at 5.
¶18; ECF No. 68-3, at 78-79. She began working under Mayo's supervision in the prison's
education building (also known as Building 4) in February of 2014. ECF No. 68-3, at 18-19.
Sarvey alleges that Mayo sexually assaulted her on September 18, 2014, while they were alone
in the maintenance elevator of Building 4.[4] ECF No. 1, at 2, ¶ 2. On October 3, 2014, before
reporting this assault, Sarvey and another inmate, Elisa Rios, filed a complaint pursuant to the
Prison Rape Elimination Act of 2003 ("PREA") against Mayo and Shank alleging that they had
sexually assaulted other inmates.[5] Specifically, Rios reported that she witnessed Shank kissing
an inmate in an office located in the education building. ECF No. 68-2, at 2. Rios also reported
that Mayo "smacked her buttocks with a ruler" and that Defendant Shank was present when this
occurred. *Id.* Sarvey reported witnessing Mayo taking an inmate onto an elevator in the
education building "to perform sexual acts." *Id.* This inmate admitted to entering the elevator
with Mayo and "embracing" him, but she denied that any sexual activity took place. *Id.* at 3.

An investigation determined that Mayo and Shank used inappropriate nicknames for
inmates and announced "code names" over the intercom to alert each other when prison

---

[3] Unless otherwise noted, the facts recited below are taken from the parties' respective Concise Statements of
Material Facts and responses thereto. [ECF Nos. 61, 67, 69]. Where a party responded to a properly supported
factual statement with: "denied as stated" and did not identify the substance of the statement that the party "denied,"
the Court has treated the statement as admitted. A denial "as stated" is, in effect, an admission to the substance of
the statement. *See, e.g., Fred v. Pa. Dept. Transp.*, 2015 WL 3875911 at *2 (M.D. Pa. June 23, 2015). Where a
party's brief has cited directly to the record without reference to a concise statement, the Court has also cited to the
record. Finally, in certain instances, the Court has cited directly to the record to assist in resolving the summary
judgment motion.

[4] There was some confusion in the record whether the alleged assault took place on September 18, 2014 or
September 19, 2014. *See, e.g.*, ECF No. 61, at 2, ¶ 4, ECF No. 66, at 3. The parties now agree that the assault took
place on September 18, 2014.

[5] The PREA is a federal law enacted to address the problem of sexual assault of prisoners. *See* 34 U.S.C. §§ 30301-
30309 (2012).

3

administrators were in the building. *Id.* at 3. The Department's Office of Special Investigations and Intelligence ("OSII") [RLI]concluded that the "abuse [was] established and the PREA allegation is substantiated" because another inmate "observed CO1 Mayo striking inmates on the buttocks with a ruler." *Id.* at 4. Mayo received a fifteen-day suspension but remained employed. Defendant Shank took medical leave and ultimately retired from the Department. ECF No. 68-17, at 41.

Sarvey filed her own PREA complaint against Mayo on October 11, 2014. ECF No. 68-18. She alleged that Mayo forced an open-mouth kiss on her, groped her breasts under her shirt and bra, and digitally penetrated her vagina while they were alone inside the maintenance elevator of Building 4 on September 18, 2014. ECF No. 1, at 8 ¶¶ 36-37, 40. *See also* ECF No. 61, at 2, ¶ 4; ECF No. 67, at 1, ¶ 4; ECF No. 68-18. During the investigation of this incident, Mayo admitted taking Sarvey into the maintenance elevator, but denied sexually assaulting her. ECF No. 68-18, at 13. The DOC ultimately concluded that it was unable to substantiate Sarvey's allegations.[6] *Id.* at 3.

After exhausting her administrative remedies, Sarvey filed her Complaint against the Defendants in this action on May 24, 2016.[7] On November 30, 2017, after the completion of discovery, Defendants Wetzel, Toma, Wilkes, and Shank filed the instant Motion for Summary

---

[6] In her brief in opposition, and then again during oral argument, counsel for Sarvey emphasized that a DOC finding that a PREA complaint is "unsubstantiated" is not a finding that the complaint is "unfounded" or that the conduct alleged did not occur. ECF No. 66 at 5. Rather, such a determination means that the evidence presented was found to be insufficient to establish that the abuse occurred. Counsel for the Defendants acknowledged that a PREA complaint is often determined to be "unsubstantiated" when no video surveillance or eyewitness verification of the abuse exists and the dispute comes down to an inmate's word against the word of the corrections officer accused of misconduct. The record concerning this issue is not well-developed, and no such policy has been advanced by Sarvey in support of her claim in this case. However, any policy that credits, or has the effect of crediting, the word of one witness or party over another without proper consideration of the multitude of factors that relate to credibility would appear to be arbitrary and contrary to principles of due process.

[7] The Defendants previously moved for partial summary judgment, arguing that Sarvey did not exhaust her administrative remedies. ECF No. 26. The Court denied that motion. ECF No. 72.

4

Judgment.[8]  The motion requires the Court to determine whether genuine issues of material fact remain regarding the claims against Defendants Wetzel, Torma, and Wilkes, as supervisors and policymakers within the DOC system, and against Defendant Shank for failing to protect Sarvey from Mayo.

IV.    Standard of Review

To prevail on a motion for summary judgment, the Defendants, as the moving parties, must demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  To assess whether the moving party has satisfied this standard, the Court does not engage in credibility determinations. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n.3 (3d Cir. 1998).  The Court views the facts and draws all reasonable inferences in the light most favorable to the non-movant, here Plaintiff Sarvey. *Scott v. Harris*, 550 U.S. 372, 378 (2007).  The moving party bears the initial burden of identifying evidence, or the lack thereof, which demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Pearson v. Prison Health Service*, 850 F.3d 526, 533-34 (3d Cir. 2017) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)).  Once that burden has been met, the nonmoving party may not rest on the allegations in the Complaint but must "go beyond the pleadings and by [their] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial'." *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

---

[8] Sarvey's allegations of sexual abuse and claims against Mayo are not under review in this motion.  Mayo has not moved for summary judgment and Sarvey's claims against him will be considered by a jury at a later date.

5

V.   Discussion

A.   Section 1983

Sarvey brings her claims pursuant to 42 U.S.C. § 1983, which provides a mechanism for individuals to recover damages and other relief for violations of rights secured by the Constitution and other federal law. The statute authorizes a federal cause of action against every person who, under color of state law "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. Importantly, Section 1983 does not create rights; it simply provides a remedy for violations of those rights created by the United States Constitution or other federal law. *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979); *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995)).

Defendants' status as state actors is not disputed. *See, e.g., Auve v. Kneiss*, 2005 WL 1322777, *1 n. 2 (M.D. Pa. June 1, 2005) (holding that remaining defendants, as present and former Department employees, are unquestionably state actors). Similarly, the moving Defendants do not dispute that Sarvey's allegations that Mayo sexually assaulted her state a deprivation of a federally protected right. The Court of Appeals recently held that sexual abuse inflicted on prisoners by prison officials can violate the constitutional protections afforded inmates under the Eighth Amendment. *Ricks*, 891 F.3d at 473. In doing so, the Court noted that such abuse "invades the most basic of dignity interests: to be treated as a human being" and is "not part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 473, 474 (quoting *Boddie v. Schneider*, 105 F.3d 857, 861 (2d Cir. 1997)).

6

The foundational question here is whether Sarvey can hold Defendants Wetzel, Torma, Wilkes, and Shank liable for Mayo's alleged unconstitutional actions. Sarvey's claims against the moving Defendants intertwine various theories of liability. She faults Defendants Wetzel, Torma, and Wilkes, as supervisors and policymakers within the DOC system, for failing to implement adequate policies relating to sexual assault in the prison, and for failing to properly supervise Mayo. ECF No. 1, at 2 ¶5. She claims that all of the moving Defendants failed to protect her from Mayo's sexual assault where the risk of such an assault was known or obvious. *Id.* at 3 ¶ 6; 21 ¶106. Each of these claims is assessed under the same deliberate indifference standard. *See Christopher v. Nestlerode*, 240 Fed. Appx. 481, 489 n. 6 (3d Cir. 2007).

B.      Supervisory Liability

Generally, state actors are liable only for their own unconstitutional conduct. *Bistrian v. Levy*, 696 F.3d 352, 366 (3d Cir. 2012). Thus, supervisors like Wetzel, Torma and Wilkes may only be held liable under § 1983 if they participated in the events that caused the constitutional violation. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (citing *Parratt v. Taylor*, 451 U.S. 527, 537 n.3 (1981)); *Rizzo v. Goode*, 423 U.S. 362, 372-73 (1976). Accordingly, individual liability can be imposed under § 1983 only if the state actor played an "affirmative part" in the alleged misconduct. *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (citing *Rode*, 845 F.2d at 1207); *Chinchello v. Fenton*, 805 F.2d 126, 133 (3d Cir. 1986). Government officials, therefore, may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*. *Id. See also Mulholland v. Gov't Cnty. of Berks, Pa.*, 706 F.3d 227, 239 (3d Cir. 2017) (citation omitted). Furthermore, "it is not enough for a plaintiff to argue that the constitutionally cognizable injury would not have occurred if the

superior had done more than he or she did." *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989).

Although *respondeat superior* is inapplicable in this context, supervisors may be liable for the unconstitutional acts of their subordinates where a sufficient causal nexus exists between the supervisors' own conduct and the subordinate's constitutional violation. *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316-19 (3d Cir. 2017), *rev'd on other grounds*, *Taylor v. Barkes*, 135 S. Ct. 2042 (2015). Specifically, the Court of Appeals has identified "two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates." *Id.* at 316. The first is when a supervisor personally joined the subordinate in violating a plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct. *Id.* (quoting *A.M. ex rel. JMK v. Luzerne Cnty. Juv. Detention Ctr.*, 372 F.3d 572, 586 (3d Cir. 2014.) This is sometimes referred to as "direct" supervisory liability. *See, e.g., Palakovic v. Wetzel*, 854 F.3d 209, 225 n. 17 (3d Cir. 2017). The second is where a supervisor, "with deliberate indifference to the consequences, established and maintained a policy, practice, or custom which directly caused [the] constitutional harm." *Id.* This is often referred to as "policy or practice" liability. *See, e.g.*, *Sloan v. Pa. Dept. Corr.*, 2017 WL 9487087 (W.D. Pa. Aug. 16, 2017); *Smart v. Allegheny Cnty.*, 2017 WL 3447888 (W.D. Pa. July 21, 2017).

This is not a "direct" supervisory liability case. Sarvey has not offered any evidence that Defendants Wetzel, Torma or Wilkes personally participated or acquiesced in, directed, or encouraged Mayo's alleged sexual assault upon her. Instead, Sarvey argues that the record is sufficient to support "policy or practice" supervisory liability against Wetzel, Torma, and

Wilkes.[9]   To hold a supervisor liable because his policies or practices led to an Eighth

Amendment violation, "the plaintiff must identify a specific policy or practice that the supervisor

failed to employ and show that: (1) the existing policy or practice created an unreasonable risk of

the Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was

created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy

or practice." *Beers–Capitol,* 256 F.3d at 134 (citing *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d

Cir. 1989)). *See also Craig v. N. J. Dept. of Corr.*, 2018 WL 4688349, at \*3 (Sept. 28, 2018).

Where the plaintiff establishes these elements, liability arises because "a state official, by virtue

of his or her *own* deliberate indifference to *known* deficiencies in a government policy or

procedure, has allowed to develop an environment where there is an unreasonable risk that a

constitutional injury will occur, and that such an injury does occur." *Barkes*, 766 F.3d at 319-20

(emphasis in original).

     C.     Supervisory Liability—Defendants Wetzel, Torma and Wilkes[10]

          1.     Identification of Policy or Practice

     In evaluating Sarvey's claims, the Court begins by noting the existence of facially valid

policies in effect prior to and at the time of Mayo's assault upon Sarvey. DOC Policy DC-

_____

[9] The Court of Appeals for the Third Circuit has "expressed uncertainty as to the viability and scope of supervisory liability" with respect to holding a supervisor indirectly liable for deficient policies or practices since the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). *See Santiago*, 629 F.3d at 130 n. 8; *Palakovic v. Wetzel*, 854 F.3d 209, 225 n. 17 (3d Cir. 2017); *Bistrian v. Levi*, 696 F.3d 352, 366 n. 5 (3d Cir. 2012); *Argueta v. U.S. I.C.E.*, 643 F.3d 60, 70 (3d Cir. 2011); *Bayer v. Monroe*, 577 F.3d 186, 190 n. 5 (3d Cir. 2009). However, the Court has held that, in the context of an Eighth Amendment deliberate indifference claim, its test for supervisory liability has survived and is consistent with *Iqbal*. *Barkes*, 766 F.3d at 319-20.

[10] Because the claims against Wetzel, Torma and Wilkes are distinct from those against Shank, the Court will separately evaluate the viability of these claims. The Court notes that Sarvey has sued Wetzel and Torma in both their official and individual capacities and the relief she seeks against them includes compensatory damages. Defendants sued in their official capacities are immune from claims for monetary damages under the Eleventh Amendment. *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (internal quotation marks omitted). *See also Singleton v. Pittsburgh Bd. of Educ.*, 2013 WL 3305486 at \*7 (W.D. Pa. July 1, 2013) (holding compensatory damages unavailable from defendants sued in their official capacities). Therefore, to the extent Sarvey seeks compensatory damages against Wetzel and Torma in their official capacities, those claims are dismissed for failure to state a claim.

ADM 008 declares that the Department prohibits "any form of sexual abuse and/or sexual harassment of an inmate." ECF No. 62-12, at 2, §1, III, A. The Department's policy defining sexual abuse of an inmate by a staff member encompasses a wide range of behavior from actual, physical contact between the vulva or anus of one and the penis of another, to voyeurism. ECF No. 62-12, at 48-49, 52, 60. Further, sexual assault is defined to include "repeated verbal comments or gestures of a sexual nature . . . including demeaning references to gender, sexually suggestive or derogatory comments about one's body or clothing, or obscene language or gestures." *Id.* at 49, 54, 60.

The Department's policy indicates that it will "designate an agency-wide PREA Coordinator to develop, implement, and oversee the Department's efforts to comply with the National PREA Standards across all facilities; and each facility shall designate a PREA Compliance Manager to coordinate the facility's efforts to comply with these standards." *Id.* at §1, III, C. The Policy also indicates that "the PREA Coordinator shall report directly to the Secretary of Corrections and/or the Executive Deputy Secretary of Corrections." *Id.* The policy applies to "an allegation of sexual abuse . . . and staff neglect or violation of responsibilities that may have contributed to such incidents . . .." ECF No. 56-1, at 113.

Of course, the existence of facially valid policies does not insulate defendants from liability where the record establishes that they acted with deliberate indifference to known or obvious consequences. *Kelly v. Borough of Carlisle*, 622 F.3d 248, 263 (3d Cir. 2010). Sarvey contends that Wetzel, Torma and Wilkes acted with deliberate indifference to her safety and the safety of other inmates by failing to implement adequate practices and procedures under the PREA. Claims, such as these, which allege a supervisor's failure to do something—failure to discipline or failure to supervise, for example—are a subcategory of policy or practice liability.

10

*Barkes,* 766 F.3d at 319-20 (citation omitted). *See also Sample,* 885 F.2d at 1117–118 (3d Cir. 1989); *City of Canton v. Harris,* 489 U.S. 378 (1989); *Heggenmiller v. Edna Mahan Corr. Inst. for Women,* 128 Fed. Appx. 240 (3d Cir. 2005). Deliberate indifference in this context may be demonstrated by either "showing that a supervisor failed to adequately respond to a pattern of past occurrences of injuries like the plaintiff's," or "by showing that the risk of constitutionally cognizable harm was 'so great and so obvious that the risk and failure of supervisory officials to respond will alone' support the finding that the two-part test is met." *Beers-Capitol,* 256 F.3d at 136-37 (citing *Sample,* 885 F.2d at 1099). "The simplest way for a plaintiff to make out such a claim is to demonstrate a supervisor's failure to respond appropriately when confronted by a pattern of injuries similar to the plaintiff's, thereby suggesting deliberate indifference on the part of the supervisor." *Counterman v. Warren Cnty. Corr. Facility,* 176 Fed. Appx. 234, 240-241 (3d Cir. 2006) (citing *Sample,* 885 F.2d at 1118).

As an initial matter, Sarvey has met her burden to identify the policies, practices or procedures that she claims are deficient. Broadly, Sarvey faults Wetzel, Torma, and Wilkes for (1) failing to "implement policies to ensure the safety of women incarcerated within the Commonwealth" generally, and at SCI-Cambridge Springs in particular, (2) failing to properly investigate allegations of sexual abuse, (3) failing to protect her following Mayo's attack on her, (4) returning Mayo to duty and forcing Sarvey to have regular contact with him, and (5) failing to monitor or supervise their subordinates. ECF No. 1, at 2, ¶ 5; ECF No. 1, at 3, ¶ 6; ECF No. 1, at 21, ¶¶ 105, 107. Specifically, Sarvey is critical of the supervisor Defendants' policies and practices relating to implementation of the PREA and its standards.[11] *See* 34 U.S.C. §§ 30301-

---

[11] When Congress adopted the PREA in 2003, it identified its purposes to include "mak[ing] the prevention of prison rape a top priority in each prison system"; implementing national standards for prison rape prevention and punishment; "protect[ing] the Eighth Amendment rights of Federal, State, and local prisoners"; and "increase[ing] the efficiency and effectiveness of Federal expenditures through grant programs such as those dealing with ... prison

11

30309 (2012); ECF No. 62-12 (Department Policy DC-ADM 008, "Sexual Harassment of or Sexual Contact with Inmates." DC-ADM 008, PREA Policy Procedures Manual; *see also Moore v. Lamas*, 2017 WL 4180378, at \*40 n.4 (M.D. Pa. Sept. 21, 2017). Her Complaint alleges that the Department failed to:

- Implement a policy of unannounced rounds [ECF No. 1. at 15, ¶ 77-78];

- Enforce PREA's limitations on cross-gender viewing and searchers, including prohibiting cross-gender pat-down searches and a PREA requirement that staff of opposite genders "announce their presence when entering a housing unit" [ECF No. 1, at 15, ¶ 79-80];

- Ensure that previous complaints of sexual harassment/assault against Defendant Mayo and Defendant Shank were properly investigated [ECF No. 1, at 16, ¶ 81-82];

- Adequately train SCI-Cambridge Springs staff on sexual abuse and sexual harassment topics, thereby resulting in repeated sexual abuse of inmates and inappropriate sexual contact between officers and inmates [ECF No. 1, at 16, ¶ 83-84];

- Adequately implement procedures, policies, training and/or supervision to ensure staff at SCI-Cambridge Springs report all instances of sexual abuse and harassment, a consequence of this being Defendant Shank's failure to report Defendant Mayo's sexual harassment of Sarvey [ECF No. 1, at 16-17, ¶ 86];

- Enforce effective separation of Defendant Mayo from Plaintiff Sarvey, contrary to PREA's instructions regarding the protection of inmate accusers [ECF No. 1, at 17, ¶ 87-88];

- Implement or enforce procedures that would have provided Sarvey with notification or information regarding the outcome of the Department's investigation of her claims against Defendant Mayo [ECF No. 1, at 17, ¶ 89-90];

---

construction, maintenance, and operation." *Walsh v. N.J. Dept. of Corr.*, 2017 WL 3835666, at \*3 (Aug. 31, 2017) (quoting 42 U.S.C. § 15602 (2)-(3), (7)-(8)). The statute's goals include "increase[ing] the accountability of prison officials and … protect[ing] the Eighth Amendment rights of Federal, State, and local prisoners." *Id.* at \*4 (quoting *Amaya v. Butler*, 2017 WL 2255607, at \*5 (S.D. Ill. May 23, 2017)). Although the PREA does not create a private right of action for an inmate, that "does not mean that this statute and [its] national standards are meaningless in litigation." *Id.* at \*3 n. 5. "[T]he fact that a prison facility may have failed to adopt and enforce national standards may, or may not, be evidence of deliberate indifference depending on the circumstances." *Id.*

- Implement PREA's presumption that termination of employment be the preferred disciplinary sanction for staff who engage in sexual abuse of inmates [ECF No. 1, at 18, ¶ 91-92];

- Report or create a method for reporting all terminations based on sexual harassment/assault to local law enforcement authorities [ECF No., at 18. ¶ 93-94].

Having determined that Sarvey has sufficiently identified the supervisor Defendants' alleged policy failures, the Court must now determine whether the record is sufficient to support findings that (1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury; (2) the supervisor Defendants were aware that the unreasonable risk was created; (3) the supervisor Defendants were indifferent to that risk; and (4) Sarvey's injury resulted from the policy or practice.

2. Pattern of Injuries/Unreasonable Risk of Harm

The record in this case does not permit a reasonable jury to find a pattern of injuries like Sarvey's or a sufficiently direct causal connection between the allegedly deficient policies and Mayo's sexual assault to permit her supervisory liability claims to proceed against Defendants Wetzel, Torma, and Wilkes. The Court of Appeals instructs that "[n]ormally, an unreasonable risk in a supervisory liability case will be shown by evidence that such harm has in fact occurred on numerous occasions." *Id. See also Brown v. Muhlenberg Township*, 269 F.3d 205, 216 (3d Cir. 2001). In other words, Sarvey needs to identify a pattern of past occurrences of injuries like those she suffered. *Beers-Capitol*, 256 F.3d at 136-37. Sarvey cannot do so.

In an attempt to show a cognizable pattern, Sarvey points to various items in the record. First, she identifies a spread-sheet which lists PREA investigations initiated by the Department's Office of Special Investigations and Intelligence at SCI-Cambridge Springs in the two years before Mayo's alleged sexual assault against her. ECF No. 68-20, at 2-5. Next, Sarvey cites a case filed in this Court in 2015 wherein the Department admitted they pursued terminating a

13

corrections officer's employment after he made sexually harassing remarks to inmates and had inmates "expose themselves" to him. ECF No. 66, at 12 (citing *Bucano v. Austin*, C.A. No. 1:15-cv-0067). And finally, Sarvey points to a Pennsylvania State Police Incident Report, detailing a complaint of sexual harassment/assault by a prison staff member (a food service instructor) against an inmate in the dietary department, neither of whom are involved in this case. ECF No. 62-11.

Although this collection of incidents may demonstrate generally that incidents of sexual harassment and sexual assault have occurred at the prison, such information is not the proper focus when determining supervisory liability. "General knowledge of prior incidents of misconduct does not place supervisory personnel on notice that a particular incident might happen with sufficient probability to charge the supervisory personnel with the scienter needed for deliberate indifference, while particularized knowledge of risk to a particular inmate or from a particular inmate can provide the awareness of risk necessary to hold a prison official liable." *Hazel v. McCullough et al.*, 2007 WL 1875807 (W.D. Pa. June 27, 2007). *See also Calloway v. U.S. Marshals Serv.*, 2007 WL 1875808 (W.D. Pa. June 27, 2007) ("[C]ircuit precedent is very clear that general knowledge of prior incidents of misconduct does not place supervisory personnel on notice that a particular incident might happen with sufficient probability to charge the supervisory personnel with the scienter requirement needed for deliberate indifference.").

The Court of Appeals' decision in *Heggenmiller v. Edna Mahan Correctional Institution for Women*, although not precedential, is instructive. In that case, inmates sued various prison supervisors for being deliberately indifferent to potential sexual assault by corrections officers. 128 Fed. Appx. 240 (3d Cir. 2005). Although prison officials were aware that corrections officers had committed three serious (and numerous less serious) sexual assaults on inmates in

14

the past, the Court of Appeals concluded such information was insufficient to impute knowledge to the supervisors that there was a "substantial risk of harm" that such an assault by officers against the plaintiff might take place." *Id.* at 245. In making this determination, the Court of Appeals expressly rejected the premise at the heart of Sarvey's case: that a collection of prison records describing unrelated assaults over a period of time can be the foundation of an Eighth Amendment claim brought by a specific inmate based on a singular assault by a corrections officer. *See, e.g., Schauer v. Lebanon Cnty.*, 2014 WL 2809633, at \*6 (M.D. Pa. June 20, 2014). This is because reports of other similar acts over a period of time say "noting about the likelihood that a particular assailant would attack a specific inmate." *Id.* (citing *Heggenmiller*, 128 Fed. Appx. at 245-46).

The evidence rejected in *Heggenmiller* is the type of evidence found in the summary judgment record here. The Pennsylvania State Police report, for example, details inappropriate sexual behavior by a staff member toward an inmate in May of 2015. ECF No. 62-11. The report, dated October 22, 2015, relates that the staff member tried to engage the inmate in conversation of a sexual manner, flicked his tongue at her in a sexual way, and brushed up against her buttocks so that she could feel his penis through her clothing. *Id.* at 3. The investigation was closed when the inmate—whose name has been redacted as has the staff member's—refused to cooperate and would not endorse the filing of criminal charges. *Id.*

The summary of the Department's PREA investigations similarly fails to support a pattern of abuse sufficient to sustain Sarvey's supervisory liability claim. Although titled "Abuse/PREA – Status Report," the document provides no evidence detailing the type of sexual abuse investigated, the resolution of the investigations, or against whom the complaints were filed. ECF No. 68-20, at 2-5. This exhibit, while showing the number of PREA claims filed at

15

SCI-Cambridge Springs from January 19, 2010 through March 13, 2017, lacks information from which a factfinder could reasonably find a pattern of sexual abuse comparable to that allegedly inflicted by Mayo on Sarvey. The document is a spread-sheet detailing case numbers, case status (all of which are marked "closed"), the date received, the date of the incident, the complainant, and the institution or person to which the complaint was assigned. *Id.* The document also contains a column for "focus of the investigations," where various unexplained codes are listed. *Id.*

This chart is silent on the nature of the sexual abuse complained of and does not include information concerning the merits of the allegations or results of investigation.[12] Further, there is no information identifying the perpetrators, which could also have been illuminating on the question of pattern. *See Tilga v. United States*, 2014 WL 12783121 at *16 (D.N.M. Dec. 5, 2014) (rejecting "generalized allegations" of PREA violations).

Lastly, the fact that the Department terminated the employment of a corrections officer—who is not a party to this action—for violating the Department's Code of Ethics by making sexually harassing comments to inmates and forcing inmates to expose themselves to him cannot be used to impute knowledge of the risks posed by behavior such as Mayo's. *See Bucano*, C.A. No. 1:15-cv-0067, ECF No. 85, at 8-9. Simply put, this evidence does not meet the exacting standards for establishing the scienter element of supervisory liability under the Eighth Amendment.

As an alternative basis for "policy or practice" supervisory liability, Sarvey may argue that this case is one of those "situations in which the risk of constitutionally cognizable harm is

---

[12] Because the Department's policy on sexual harassment and sexual abuse covers a wide range of sexual behavior, *see discussion, supra.*, this document's silence on the nature of the alleged conduct is particularly problematic for pattern identification. *See* DC-ADM 008.

so great and so obvious that the risk and the failure of supervisory officials to respond will alone support findings of the existence of an unreasonable risk . . . and of indifference to it.'" *Beers–Capitol*, 256 F.3d at 134 (quoting *Sample*, 885 F.2d at 1118). Put another way, "[w]hen the risk of harm is great enough, failure to respond to that risk can be circumstantial evidence of deliberate indifference." *Beers-Capitol*, 256 F.3d at 133-34. This theory of liability against the supervisor Defendants also fails, however, because the record is insufficient to allow a jury to find that Mayo posed a great and obvious risk to which they failed to respond.

On this point, *Beers-Capitol* is instructive. There, the Court of Appeals held that male corrections officers working at a juvenile detention center for girls did not pose an obvious risk that they would exploit their positions in order to sexually assault the inmates. 256 F.3d at 135-36. The Court, despite evidence that the risk of sexual misconduct by inmates was the subject of staff training programs, did not think a hypothetical risk of sexual misconduct by corrections officers was legally relevant. *Id.* The more salient inquiry—the Court of Appeals noted—was what a supervisor knew about an actual pattern of sexual abuse by corrections officers. *Id.* Since the evidence in *Beers-Capitol* showed that the supervisor was only aware of two allegations of sexual misconduct by the corrections officers, sufficient evidence did not exist to hold the supervisor to have been deliberately indifferent. *Id.* at 137-38. That the supervisors in *Beers-Capitol* failed to implement what the Court of Appeals believed to be "seemingly obvious" precautions and policies that were recommended by the American Corrections Association and which may have reduced the risk of a corrections officer exploiting time alone with an inmate was evidence of negligence, but not of deliberate indifference. *Id. See also Hazel*, 2007 WL 1875807, at *6.

17

Like the circumstances in *Beers-Capitol*, the record in this case establishes that the supervisor Defendants may have been on notice of two incidents of potentially relevant misconduct by Mayo. The first instance in the record is a copy of a 2008 report and reprimand Mayo received for unprofessional conduct. ECF No. 68-7, at 2. This report stems from an inappropriate personal relationship with a co-worker. *Id.* at 4. The report did not involve sexual harassment or assault against an inmate. Second, Sarvey points to deposition testimony of two prison employees as evidence of the risk posed by Mayo. Jamie Rodriguez, a corrections unit manager at SCI-Cambridge Springs, stated that she and at least one other staff person at the prison thought Mayo was "creepy." ECF No 68-13, at 9. Although she testified that Mayo had a reputation for being a "player" and a "flirt," she had never seen him flirt with inmates. *Id.* She testified that some inmates told her Mayo had flirted with them, including Sarvey and other inmates in Building 4. *Id.* Rodriguez also testified that other employees at the prison thought Mayo was "creepy." *Id.* Sarvey maintains that this testimony shows a wide awareness of the risk Mayo posed of committing sexual assault. ECF No. 66, at 13. The Court disagrees. There is no evidence that Rodriguez informed any of the supervisor Defendants that she thought Mayo was "creepy" or that inmates told her that Mayo flirted with them. Further, Mayo's reputation as a "creep" or a "player" is not sufficient to identify him as posing a "substantial risk of serious harm." *Farmer*, 511 U.S. at 842.

Another co-worker, corrections officer Samantha Pring, testified in her deposition that Mayo was "creepy," and that on one particular instance, Mayo moved toward her in what she reasonably interpreted as a "sexual advance." ECF No. 68-12, at 15-17. But Pring also testified that she never spoke to anyone at the prison—including any of the supervisor Defendants—about Mayo. *Id.* at 15. Like Rodriguez' testimony, Pring's testimony does not help Sarvey. While

18

certain of Mayo's coworkers in the prison felt he was a "player," or "creepy," or "a flirt," it does not follow that the supervisor Defendants were on notice that he posed a substantial and obvious risk of serious harm to Sarvey or inmates in general.

In sum, the evidence of record is insufficient to raise a genuine issue of material fact that the supervisor Defendants were aware that an unreasonable risk existed relating to any alleged deficient policy, practice, or procedure that led to Mayo's assault upon Sarvey. Therefore, the Court will grant Defendants Wetzel, Torma, and Wilkes' motion for summary judgment to the extent that it seeks dismissal of Sarvey's claim of supervisory liability based upon policies or practices alleged to have permitted or facilitated Mayo's physical assault or assaults upon her.

D.    Claims Based Upon Supervisor Defendants' Failure to Protect Sarvey Prior to Mayo's Assault

The Eighth Amendment's prohibition against the infliction of cruel and unusual punishment has been interpreted to impose upon prison officials a duty to take reasonable measures "'to protect prisoners from violence at the hands of other prisoners.'" *Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997) (quoting *Farmer*, 511 U.S. at 825). Importantly, *Farmer* has been interpreted to apply to assaults on inmates committed by guards. *See, e.g., Farmer*, 511 U.S. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) ("Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.' ")); *Miskovitch v. Lt. Hostoffer*, 2010 WL 2404434, at \*4 (May 19, 2010) (citing *Farmer*, 511 U.S. at 833 ("[T]he Eighth Amendment requires prison officials to take reasonable measures to protect prisoners from violence at the hands of other prisoners, as well as at the hands of guards or other state actors.")).

In order for her "duty to protect" theory of liability to survive the Defendants' summary judgment motion, Sarvey "is obligated to produce sufficient evidence to support the inference

19

that defendants 'knowingly and unreasonably disregarded an objectively intolerable risk of harm.'" *Jones v. Day*, 2007 WL 30195 (W.D. Pa. Jan. 4, 2007) (citing *Beers-Capitol*, 256 F.3d at 132 (3d Cir. 2001)). Again, such a claim "be it for failure to protect, denial of equal protection, or deliberate indifference to medical needs, may not be premised solely on a *respondeat superior* theory of liability asserting that the supervisor is vicariously liable for the actions of his subordinates." *Campoverde v. Lanigan*, 2016 WL 4975197 at *2 (D.N.J. Sept. 16, 2016) (citations omitted).

Sarvey's principal evidence in support of her failure to protect claim is the deposition testimony of Mayo's supervisor, Richard Wellington. *See* ECF No. 68-15, at 56-61. Sarvey points to Wellington's testimony that "management" tolerated Mayo and Shank putting inmates at risk, that this was done out of "laziness," and that it was his belief that this laziness was tantamount to "recklessness." *Id*. at 53-56. When he spoke of "management," however, Wellington was not talking about the supervisor Defendants in this case:

> Q:     When you say the word management, do you have a
>        personal knowledge as to whether Superintendent
>        Wilkes or Superintendent Torma knew anything
>        about what CO Mayo or Shank may or may not
>        have been up to?
>
> A:     I don't believe they knew.

*Id*. at 61. The supervisor Defendants cannot protect Sarvey from risks or dangers concerning which they have no knowledge. At best, the record in this case includes speculation and innuendo regarding the supervisor Defendants' knowledge of Mayo's misconduct or potential for misconduct. This evidence does not raise a genuine issue of material fact that the supervisory Defendants had actual knowledge of Mayo's alleged abuses or misconduct prior to his assault upon her.

Sarvey's attempt to impose liability on the supervisor Defendants for a lack of security cameras in some locations of SCI-Cambridge Springs likewise fails. *See* ECF No. 66, at 9. For certain, "prison blind spots undoubtedly create a risk of danger to inmates, making prison officials' knowledge of a blind spot relevant to the deliberate indifference inquiry." *Lee v. Link*, 2018 WL 1156154, at *3 (E.D. Pa. March 5, 2018). But "knowledge of the existence of a blind spot, standing alone, does not support the reasonable inference that prison officials knew of a substantial risk of serious harm to inmate safety." *Id. See also Blueberry v. Comanche Cty. Facilities Auth.*, 672 Fed. Appx. 814, 818 (3d Cir. 2016) (affirming the dismissal of a failure-to-protect claim at the summary judgment stage based in part on the lack of any evidence that prison blind spots "presented such an obvious risk that [the prison] was aware of them before the incidents alleged in this case"); *Mitchell v. New York*, 2015 WL 13019618, at *3 (N.D.N.Y. Mar. 11, 2015) (holding a plaintiff's "conclusory claim that the 'common area' had a 'propensity to be highly violate' due to a 'blind spot,' " was insufficient to state a failure-to-protect claim absent some allegation that the defendant "was aware of specific deficiencies in the security in that area and failed to act, despite knowledge that 'a substantial risk of attacks in the [area] was pervasive and well-documented' " (citation omitted)). *Cf Marten v. Burns*, 2015 WL 1431079, at *5 (W.D. Pa. Mar. 27, 2015) (denying summary judgment on a failure-to-protect claim based on evidence that prison officials knew that architectural blind spots existed in the prison's concrete yards and that assaults occurred in the blind spots which were not detected by surveillance cameras or staff). Here, again, the evidence is insufficient to support a finding of a pattern of guard-on-inmate assaults in elevators or other areas not subject to surveillance, or that the supervisor Defendants were aware of such assaults. Accordingly, the Court finds that summary judgment

should be entered in favor of Defendants Wetzel, Torma, and Wilkes on Sarvey's failure to protect claim to the extent it is based upon Mayo's assault or assaults upon her.

E.  Claims Based Upon Supervisor Defendants' Failure to Protect Sarvey After Mayo's Assault

Sarvey additionally contends that the supervisor Defendants failed to protect her because they did not separate Mayo from her following her report of the assault, thereby subjecting her to "continuing psychological and physical trauma." ECF No. 1 at 21, ¶107. Here, she argues that Mayo's continued employment at the prison subjects her to hearing Mayo's voice over the prison intercom, and to him having "in-person contact with [her] multiple times, including on the prison walkway, in the cafeteria, and most disturbingly, in her residential unit." ECF No. 66 at 14-15. Although these facts cannot serve as a basis for liability for Mayo's September 18, 2014 sexual assault because they occurred after that assault, *Beers-Capitol*, 256 F.3d at 138, the Court finds that genuine issues of material fact remain regarding whether the supervisor Defendants' practice of knowingly continuing to expose Sarvey to Mayo, her alleged attacker, establishes an independent Eighth Amendment violation for which Sarvey may be entitled to injunctive relief and nominal damages.

Requiring a sexual assault victim regularly and unnecessarily to encounter and observe her attacker and hear the sound of her attacker's voice is likely to cause unwarranted and potentially extreme distress to the victim. Although the record is not well-developed concerning the frequency Sarvey is forced to encounter Mayo, Sarvey did testify that Mayo was assigned to her residential unit at least once, and that she spent that night in the infirmary as a result. ECF No. 68-3, at 108. She also testified that she has had further "in-person contact" with Mayo when she has seen him "a few" times on the walkway and once in the prison yard. *Id.* at 109-110.

22

Further troubling is Mayo's use of the intercom, which the Defendants admit is one of the duties associated with the new posting he was given after completing a suspension. ECF No. 60, at 5-6. Although the record is unclear how often Sarvey hears Mayo's voice over the intercom or the substance or duration of his announcements, Sarvey testified that hearing Mayo's voice causes her distress and prompts her to discuss the matter, among other things, with a counselor "about once a month." ECF No. 68-3, at 108. The supervisor Defendants are and have been aware that Mayo's new assignment forces Sarvey periodically to encounter Mayo and regularly to hear his voice over the intercom. Allowing the current arrangement to continue may ultimately be determined to constitute deliberate indifference.

On this record, however, Sarvey's potential relief on this claim is limited to injunctive relief because she has not alleged that she sustained any physical injury as a result of being forced to encounter Mayo or having to hear Mayo's voice. Instead, she testified only that she "goes to counseling that comes in from the outside about once a month now." ECF No. 68-3, at 108. The Prison Litigation Reform Act ("PLRA") provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a showing of physical injury." 42 U.S.C. § 1997e(e). The "physical injury" requirement of § 1997e(e) may be satisfied by a "less-than-significant-but-more-than-de minimis physical injury as a predicate to allegations of emotional injury." *Mitchell v. Horn*, 318 F.3d 523, 534 (3d Cir.2003). However, the PLRA "does not bar claims for nominal damages, punitive damages, or prospective equitable relief, such as injunctive or declaratory relief." *Joseph v. Asure*, 2012 WL 3613962, at *3 (M.D. Pa. Aug. 2, 2012), *report and recommendation adopted*, 2012 WL 3620376 (M.D. Pa. Aug. 21, 2012) (citing *Mitchell*, 318 F.3d 523 at 533-34). Here, Sarvey has failed to offer evidence that she suffered a physical injury

as a result of encountering Mayo and hearing his voice over the prison intercom after his assault upon her. Defendants Wetzel, Torma, and Wilkes are therefore entitled to summary judgment on Sarvey's demand for compensatory damages as to this aspect of her Eighth Amendment claim, but summary judgment is denied as to her request for injunctive relief and nominal damages against these Defendants.

VI.     Failure to Intervene or Report – Defendant Shank

The Court separates its discussion of Defendant Shank because the nature of the claims and evidence against him differ from those against Defendants Wetzel, Torma, and Wilkes. Sarvey acknowledges that Shank is neither a policymaker nor a supervisor and admits that Shank was not present when Mayo assaulted her. Nonetheless, she contends Shank is liable for Mayo's sexual assault because he was aware of the substantial risk Mayo posed to her and disregarded it. ECF No. 66, at 18. She argues that liability should be imposed on Shank for his failure to report Mayo's actions and for his failure to intervene and protect her from Mayo.

The Court of Appeals has specifically concluded that "a corrections officer's failure to intervene in [an assault] can be the basis of liability for an Eighth Amendment violation under § 1983 if the corrections officer had a reasonable opportunity to intervene and simply refused to do so." *Smith v. Messinger*, 293 F.3d 641, 650 (3d Cir. 2002); *Ricks*, 891 F.3d at 479. In order to impose liability under this theory, Sarvey must produce evidence to show that Shank "ignored a realistic opportunity to intervene" in Mayo's assault. *Smith*, 293 F.3d at 652; *Ricks*, 891 F.3d at 479. The evidence in this case, however, cannot support a finding that Shank was in a position to observe, let alone intervene in Mayo's assault upon Sarvey.[13]

---

[13] Despite her citation to his deposition testimony, Sarvey's contention that Shank had "direct visibility into Mayo's misconduct" is unfounded. Nothing in the summary judgment record supports this assertion. And, Sarvey's citation to his testimony is incorrect. Shank only testified that "I made sure that the inmates coming in and out of the building – Building 4 – were accounted for, ID cards were surrendered for accountability and Officer Mayo took

Rather, Sarvey appears to be advancing a more sweeping theory of peer-employee

liability than the one recognized in *Smith* and *Ricks*. Under this theory, Shank would face

liability for Mayo's assault based upon his failure to report Mayo's earlier misconduct, including

incidents of striking inmates on the buttocks with a ruler. Shank admits to striking inmates with

a ruler, ECF. No. 68-17 at 25, and that he was present when Mayo hit Sarvey and other inmates

on their buttocks with a ruler. *See* ECF No. 60, at 15. In his deposition, Shank related:

Q: Did Officer Mayo have a ruler?

A: I probably have seen him with mine.

Q: Okay. What have you seen him doing with yours?

A: I would have to say, you know – I saw him sitting there with it. Did I see him hit an inmate with it? Yes.

Q; Okay. Did you see that once? Did you see that a couple of times?

A: I would say a couple of times.

Q: Okay. Do you remember how the inmates reacted?

A: It was more of a jokey thing.

Q: Did Officer Mayo say anything about it at the time?

A: Nope.

ECF. No. 68-17 at 25.

This evidence, as the Department's OSII itself concluded, established a violation of the

PREA, and resulted in disciplinary action against Mayo. It is also undisputed that Shank did not

report Mayo's striking of inmates on the buttocks with a ruler to appropriate personnel within the

care of the everyday function of the building." ECF No. 68-17 at 7. His testimony says nothing about Shank's ability to witness Mayo entering or exiting the elevator with an inmate.

prison and only acknowledged Mayo's misconduct during the investigation that followed Rios and Sarvey's submission of their October 3, 2014 PREA complaint.

Sarvey's theory presumably posits that had Shank properly reported Mayo's earlier misconduct, a disciplinary response would have intervened to prevent the assault in the elevator. This nexus, however, is too attenuated to support Sarvey's claim. While Shanks's failure to report (and potentially to intervene and stop) Mayo's striking of inmates with a ruler evidences employee misconduct on the part of Shank and grounds for discipline against him, it is not reasonably connected to Mayo's assault upon Sarvey in the elevator on September 18, 2014. Shank's failures to report Mayo's earlier misconduct do not provide a basis for a jury to reasonably conclude that Shank could have intervened to prevent that assault. These failures are too remote in time and substance from the September 18, 2014 assault to support liability under *Smith* and *Ricks*.

Finally, the evidence concerning Mayo's striking Sarvey and other inmates on the buttocks raises the issue of whether this misconduct constituted an Eighth Amendment violation separate and distinct from Mayo's assault in the elevator. If it does, Shank may face liability under *Smith* and *Ricks* for failing to intervene to prevent or end it. The Court finds, however, that the evidence relating to this incident is insufficient to support a separate Eighth Amendment violation and, therefore, it cannot support a claim against Shank based upon his failure to intervene.

A two-part analysis governs the determination of whether an incident of misconduct towards an inmate rises to the level of an Eighth Amendment violation. The first element is objective and is satisfied only if the incident in question is "objectively, sufficiently intolerable and cruel, capable of causing harm . . .." *Ricks*, 891 F.3d at 475. The second element is

26

subjective and inquires "whether the official had a legitimate penological purpose or if he or she acted 'maliciously and sadistically for the very purpose of causing harm.'" *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 319-320 (1986)). When evaluating the objective element, the Supreme Court has warned that "not…every malevolent touch by a prison guard gives rise to a federal action." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). "Rather, in contrast to common tort law, the Eighth Amendment shields inmates from only those actions 'repugnant to the conscience of mankind.'" *Ricks*, 891 F.3d at 475-476 (quoting *Hudson*, 503 U.S. at 10). "The objective element 'is therefore contextual and responsive to 'contemporary standards of decency.'" *Ricks*, 891 F.3d at 476 (citations omitted). "And 'conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional.'" *Id.* (citing *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

Having considered the record, pertinent caselaw, "the scope, place, and timing of the offensive conduct," *Ricks*, 891 F.3d at 478, the Court concludes that Mayo's actions in hitting Sarvey's buttocks with a ruler falls short of this objective standard. It has been routinely held that isolated incidents of similar severity are insufficient to support a cognizable Eighth Amendment claim. *See, e.g., McIntyre v. Kellinger*, 2018 WL 3429964, at \*1 (3d Cir. July 16, 2018) (holding that incident in which defendant dragged his hands down plaintiff's buttocks, gripped his buttocks, patted his thighs, and "squeezed [his] ass as if [he] was a woman" while whispering "in a sexual manner" during a pat-search was not objectively severe or serious to establish an Eighth Amendment violation); *Ricks*, 891 F.3d at 479 (suggesting that an "isolated, momentary" incident in which guard "rubbed his erect penis against [plaintiff's] buttocks through both men's clothing" was not sufficiently severe, but allowing opportunity to amend); *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997) (allegations that a female correction

27

officer squeezed plaintiff's penis, said "[Y]ou know [you're] a sexy black devil, I like you," bumped into plaintiff with her breasts, and pinned him against the wall "with her whole body vagina against penis" were not sufficiently serious to amount to an Eighth Amendment violation); *Watson v. Wingard*, 2018 WL 2108316 (W.D. Pa. Jan. 31, 2018) (allegations that defendant gave plaintiff an "upper cut" to the groin with his forearm, "groped and massaged [his] penis," and examined plaintiff's "butt . . . like a doctor" did not amount to sexual abuse); *Washington v. Harris*, 186 Fed. Appx. 865, 866 (11th Cir. 2006) (holding that inmate failed to state Eighth Amendment claim where a prison guard "crept up behind [the prisoner inmate] while he was working," grabbed his genitals, kissed him on the mouth, and threatened to perform oral sex on him); *Jackson v. Madery*, 158 Fed. Appx. 656, 661 (6th Cir. 2005) (holding that the plaintiff's allegations that a guard grabbed and rubbed his buttocks in a degrading manner during a shakedown in the food area was insufficient to establish an Eighth Amendment violation); *Hughes v. Smith*, 237 Fed. Appx. 756, 759 (3d Cir. 2007) (no Eighth Amendment violation where correctional officer allegedly touched the inmate's testicles through his clothing during a single pat-down frisk); *Pantusco v. Sorrell*, 2011 WL 2148392, at \*7–8 (D.N.J. May 31, 2011) (defendant did not violate Eighth Amendment by groping plaintiff's genitals on a single occasion during a routine pat-search); *Harris v. Zappan*, 1999 WL 360203 (E.D. Pa. May 28, 1999) (allegations of one instance of sexually explicit comments combined with fondling and rubbing on thighs and breasts not sufficiently serious for an Eighth Amendment violation); *Jones v. Culinary Manager II*, 30 F.Supp.2d 491, 497 (E.D. Pa. 1998) (a single incident alleging that a guard pinned plaintiff and ground his pelvis against plaintiff's buttocks while threatening sex not sufficiently serious). Mayo's alleged behavior with a ruler, while certainly inappropriate and unprofessional, was no more egregious than the allegations addressed in many of the cases cited

28

above. Nor does it fall within the examples of misconduct identified in *Ricks*. *See Ricks*, 891 F.3d at 478 (defining serious sexual contact to include "sexualized fondling, coerced sexual activity, combinations of ongoing harassment and abuse, and exchanges of sexual activity for special treatment or to avoid discipline"). As this Court has previously noted, "the standard for sexual assault is not "zero tolerance for all minor sexualized touching in prison, such that all such claims are objectively serious to a constitutional degree." *Armstrong v. Diraimo*, 2018 WL 6788524, at \*4 (W.D. Pa. Dec. 28. 2018) (citing *Ricks*, 891 F.3d at 477). Mayo's inappropriate behavior with the ruler does not in any way trivialize the mistreatment Sarvey allegedly experienced. But such behavior does not amount to a cognizable constitutional violation.

Thus, under applicable legal standards, the record on this point is insufficient to permit a reasonable jury to conclude that Shank violated Sarvey's constitutional rights by either failing to intervene or report Mayo's assault or protect her from it. Therefore, the Court will enter summary judgment in favor of Shank.

VII.    Conclusion

For the reasons stated above, the motion for summary judgment of Defendants John Wetzel, Joanne Torma, Joyce Wilkes, and Brian Shank is granted in part and denied in part. The motion is denied as to Plaintiff Sarvey's claim for injunctive relief and nominal damages against John Wetzel, Joanne Torma and Lonnie Oliver (as successor to Torma). The motion is granted in all other respects. An appropriate order will follow.

RICHARD A. LANZILLO
UNITED STATES MAGISTRATE JUDGE

DATED: January 16, 2019.

29